# In the United States Court of Federal Claims

No. 10-580 L

(E-Filed: May 24, 2011)

| | |
|---|---|
| WOLFSEN LAND & CATTLE COMPANY, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

Motion to Intervene Under Rule 24(a)(2) Denied; Applicants' Interests Are Indirect and Contingent on Future Events; Applicants Are Able to Protect Their Interests in Another Forum; The United States Adequately Represents the Applicants' Interests; Applicants' Motion is Timely

Roger J. Marzulla, Washington, DC, for plaintiffs. Nancie G. Marzulla, Washington, DC, Thomas E. Campagne, Fresno, CA, and Michael Nordstrom, Corcoran, CA, of counsel.

William J. Shapiro, with whom was Ignacia S. Moreno, Assistant Attorney General, Environment and Natural Resources Division, United States Department of Justice, Washington, DC, for defendant.

Philip Atkins-Patterson, San Francisco, CA, for Pacific Coast Federation of Fishermen's Associations; John Echeverria, South Royalton, VT, of counsel.

Jennifer A. Sorenson, San Francisco, CA, for Natural Resources Defense Council; Philip Atkins-Patterson and Katherine S. Poole, San Francisco, CA, and John Echeverria, South Royalton, VT, of counsel.

## OPINION AND ORDER

HEWITT, Chief Judge

Before the court are Pacific Coast Federation of Fishermen's Associations and Natural Resources Defense Council's Motion to Intervene as Defendants (Motion to Intervene or Mot.), filed March 8, 2011, Docket Number (Dkt. No.) 15; Memorandum in Support of Pacific Coast Federation of Fishermen's Associations and Natural Resources

Defense Council's Motion to Intervene as Defendants (Memorandum or Mem.), filed March 8, 2011, Dkt. No. 16; Declaration of Glen H. Spain in Support of Pacific Coast Federation of Fishermen's Associations and Natural Resources Defense Council's Motion to Intervene as Defendants (Spain Decl.), filed March 8, 2011, Dkt. No. 17; Declaration of Linda Lopez in Support of Pacific Coast Federation of Fishermen's Associations and Natural Resources Defense Council's Motion to Intervene as Defendants, filed March 8, 2011 (Lopez Decl.), Dkt. No. 18; Declaration of Monty Schmitt in Support of Pacific Coast Federation of Fishermen's Associations and Natural Resources Defense Council's Motion to Intervene as Defendants (Schmitt Decl.), filed March 8, 2011, Dkt. No. 19; Plaintiffs' Opposition to the PCFFA and NRDC's Motion to Intervene as Defendants (plaintiffs' Opposition or Pls.' Opp'n), filed March 22, 2011, Dkt. No. 22; and Reply in Support of Motion to Intervene as Defendants of Pacific Coast Federation of Fishermen's Associations and Natural Resources Defense Council (Reply), filed April 1, 2011, Dkt. No. 23.  Also before the court is plaintiffs' Complaint for Just Compensation (Complaint or Compl.), filed August 26, 2010, Dkt. No. 1.[1]

Pursuant to Rule 24(a) of the Rules of the United States Court of Federal Claims (RCFC), Pacific Coast Federation of Fishermen's Associations (PCFFA) and Natural Resources Defense Council (NRDC) (collectively, the applicants) move to intervene as of right as defendants.  Mot. 1.  Pacific Coast Federation of Fishermen's Associations "is the largest trade organization of commercial fishermen on the West Coast," Mem. 2 (citing Spain Decl. ¶ 4), and represents "nearly 1,200 small and mid-sized commercial fishing boat owners and operators, most of whom derive all or part of their income from the harvesting of Pacific salmon," Mem. 3 (citing Spain Decl. ¶ 4).  The Natural Resources Defense Council is "a national nonprofit organization" with more than 70,000 members living in California, Mem. 3 (citing Lopez Decl. ¶ 3), and has worked "to restore fish and wildlife habitat, floodplains, and water quality in the Central Valley" of California, Mem. 3 (citing Schmitt Decl. ¶ 3).

According to the applicants, "The defendant takes no position on PCFFA and NRDC's intervention," Mem. 2, and defendant has filed no brief regarding the applicants' Motion.  Plaintiffs oppose the applicants' Motion.  <u>See</u> Pls.' Opp'n <u>passim</u>.  For the following reasons, the applicants' Motion to Intervene is DENIED.

---

[1]Plaintiffs did not label the introductory paragraph of their Complaint for Just Compensation (Complaint or Compl.) with paragraph numbers.  When referring to the introductory paragraph of plaintiffs' Complaint, the court refers to page numbers.  Where the plaintiffs provided paragraph numbers for subsequent paragraphs in the Complaint, the court refers to paragraph numbers.

I.       Background

"The San Joaquin River [(River)] is the 'main artery' of California's second-largest river system."  Mem. 4 (quoting Natural Res. Def. Council v. Patterson (Patterson), 333 F. Supp. 2d 906, 908 (E.D. Cal. 2004)); Compl. ¶ 4.  In the early 1940s, the United States Bureau of Reclamation (Bureau) built the Friant Dam (Dam) across the upper San Joaquin River, together with an adjacent, upstream storage reservoir and irrigation canals, in order to divert water from the River to areas of semi-arid farmland that had previously been short of or entirely without water.  Compl. ¶¶ 6-7; see Mem. 4.  "As a result, the Friant Dam diverted virtually all of the San Joaquin River's natural flow to irrigation purposes and approximately 60 to 100 miles of the San Joaquin River's old original riverbed channel has lain continuously dry for approximately the last 63 years . . . ."  Compl. ¶ 7; Mem. 4 (stating that "for a half century, sixty miles of the River lay 'continuously dry' in most years" (quoting Patterson, 333 F. Supp. 2d at 910)).  "[T]he Dam's operation 'diminished the area available for fish, increased the temperature of the water that is available, reduced the ability of the River to assimilate agricultural runoff and other pollutants, and substantially degraded riparian vegetation.'"  Mem. 4-5 (quoting Patterson, 333 F. Supp. 2d at 911).  In addition, the chinook salmon, which had used the River for their annual migrations, "were 'extirpated from the length of the River.'"  Mem. 4 (quoting Patterson, 333 F. Supp. 2d at 910); Compl. ¶ 14.

In 1988 NRDC, PCFFA and others sued the Bureau and other federal agencies claiming "violations of state and federal law, including California Fish and Game Code section 5937, a law predating the Dam's construction that requires the owner of any dam to 'allow sufficient water to pass over, around or through the dam [and] to keep in good condition any fish that may . . . exist below the dam[,]' section 8 of the Reclamation Act of 1902, 43 U.S.C. § 383, which makes Fish and Game Code section 5937 applicable to the federal government[,] and the Endangered Species Act."  Mem. 5 (quoting Act of May 24, 1915, ch. 491, § 1, 1915 Cal. Stat. 820) (citing Patterson, 333 F. Supp. 2d at 913-14).  After a pair of rulings in 2004 and 2005 by the United States District Court for the Eastern District of California finding violations of state and federal law by the Bureau, Mem. 6 (citing Patterson, 333 F. Supp. 2d at 925; Natural Res. Def. Council v. Patterson, No. CIV S-88-1658 (E.D. Cal. July 28, 2005), ECF No. 1147), on September 13, 2006 the parties entered into a settlement agreement (Settlement), conditional on Congress' passage of authorizing legislation, to restore water flows for salmon in the San Joaquin River below the Friant Dam, Mem. 6 (citing Schmitt Decl. Ex. A (Notice of Lodgment of Stipulation of Settlement); Natural Res. Def. Council v. Rodgers, No. CIV S-88-1658 (E.D. Cal. Oct. 23, 2006), ECF No. 1377); Compl. ¶ 16.  The Settlement contains provisions for structural improvements to the San Joaquin River channel, the

reintroduction of water to the San Joaquin River channel and the reintroduction of chinook salmon to the River.  Compl. ¶ 18; Mem. 7 (citations omitted).

As contemplated by the Settlement, Congress enacted and on March 30, 2009 President Barack Obama signed the San Joaquin River Restoration Settlement Act (Settlement Act or Act), Pub. L. No. 111-11, §§ 10001-10011 (2009), which authorizes and directs the Secretary of the Interior (the Secretary) to implement the terms and conditions of the Settlement, including modification of the operations of the Friant Dam to provide restoration flows of water into the San Joaquin River, Mem. 6 (citing, inter alia, Pub. L. No. 111-11, § 10004(a)); Compl. ¶ 17 (citing Pub. L. No. 111-11, § 10004(a)).  "Both the Settlement and the Settlement Act grant the Secretary some discretion in how the River will be restored, including some discretion to reduce the amount of water released for fish."  Mem. 8.

"In compliance with the [Settlement Act], on October 2, 2009, the Bureau of Reclamation opened the valves at the base of Friant Dam . . . ."  Compl. ¶ 20; see Mem. 1.  This first release of water from the Dam was followed by two subsequent releases in November 2009 and February 2010, and "[e]ven greater releases are anticipated for the future as the Bureau of Reclamation continues to comply with the statutory mandate."  Compl. ¶ 20.

On August 26, 2010 plaintiffs Wolfsen Land & Cattle Company, et al., filed their Complaint in this court, bringing claims against the United States (government or defendant) under the Takings Clause of the Fifth Amendment "to recover just compensation for the legislative and physical taking of approximately 12,973 acres of prime agricultural land, buildings, and crops located in the Central Valley of California together with appurtenant water rights."  Compl. 1-2.  Plaintiffs claim that "[t]his taking is the direct and foreseeable result of Congress' passage of the [Settlement Act] and implementation of that statute by the acts of the United States Bureau of Reclamation."  Compl. 2.  According to plaintiffs, the government's compliance with the Settlement Act led to "new and substantial releases of water into the formerly dry bed of the San Joaquin River" which "flood[ed], erode[d], seep[ed] under, and physically inundate[d] [plaintiffs'] properties, thereby taking their property for public use because [plaintiffs] are located immediately adjacent to the formerly dry riverbed of the San Joaquin."  Compl. ¶ 21; see Compl. ¶ 3.  The only relief sought by plaintiffs is just compensation for their takings claims and various litigation expenses.  See Compl. 1-2; Compl. Prayer for Relief ¶¶ 1-4.

On December 9, 2010 "the parties notif[ied] the [c]ourt that they wish[ed] to pursue resolution of this case using the alternative dispute resolution processes with

Judge Firestone as a settlement judge," Joint Notification for Referral to Settlement, Dkt. No. 7, and on the same day, the case was so assigned, Order of Dec. 9, 2010, Dkt. No. 8; Notice of Assignment to ADR Judge Nancy B. Firestone, Dkt. No. 9.  The parties first met with Judge Firestone on December 13, 2010, Pls.' Opp'n 3, and on January 25, 2011 "the parties filed a joint proposal under seal for addressing various issues in the litigation," Pls.' Opp'n 4.  According to plaintiffs, "Judge Firestone has asked the parties to execute a confidentiality agreement for this proceeding, in which each party agrees to maintain the confidentiality of the materials and sessions.  In that confidentiality agreement, the parties expressly agree that no other party may participate in a settlement session without the consent of the parties and the ADR judge."  Pls.' Opp'n 4.  The parties are currently in the alternative dispute resolution process with Judge Firestone.

On March 8, 2011 the applicants filed their motion to intervene and supporting documents.  The applicants move to intervene as of right as defendants because they claim that "a judgment for the plaintiffs would trigger statutory provisions directly affecting the applicants' interests in restoring the San Joaquin River and its depleted salmon populations."  Mem. 1.  In particular, the applicants assert that "[a] judgment for [plaintiffs], depending on its terms, could require the United States to take or refrain from taking certain actions under the Settlement Act" and "would influence the Secretary's exercise of discretion in implementing some aspects of the Settlement."  Mem. 8.  The applicants further assert that the "results of an adverse judgment in this action would directly impair the Settlement's prospects for success and would jeopardize PCFFA[] and NRDC's unique interests in implementing and defending the Settlement, enforcing California Fish and Game Code section 5937, and restoring the San Joaquin River."  Mem. 8.

II.    Legal Standards

Intervention as a matter of right is governed by Rule 24(a) of the RCFC, which states in relevant part:

> On timely motion, the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

RCFC 24(a).[2]  In other words, "To succeed on a motion to intervene of right under RCFC 24(a), applicants 'must show that:  (1) they have an interest relating to the property or transaction that is the subject of the action; (2) without intervention the disposition of the action may, as a practical matter, impair or impede the applicants' ability to protect that interest; . . . (3) their interest is inadequately represented by the existing parties;'" and (4) their motion to intervene is timely.  <u>Chippewa Cree Tribe of the Rocky Boy's Reservation v. United States</u> (<u>Chippewa Cree</u>), 85 Fed. Cl. 646, 654 (2009) (quoting <u>Freeman v. United States</u>, 50 Fed. Cl. 305, 308-09 (2001)).  If an applicant demonstrates the existence of each factor, "the court is without discretion, and the movant 'shall be permitted to intervene,'" <u>Fifth Third Bank of W. Ohio v. United States</u>, 52 Fed. Cl. 202, 203 (2002) (quoting RCFC 24(a)); however, "[i]f an applicant fails to demonstrate any one of these factors, the application to intervene of right is denied," <u>Chippewa Cree</u>, 85 Fed. Cl. at 654.  The court is "entitled to the full range of reasonable discretion in determining whether the[] requirements [for intervention of right] have been met."  <u>Rios v. Enter. Ass'n Steamfitters Local Union No. 638 of U.A.</u>, 520 F.2d 352, 355 (2d Cir. 1975) (citation omitted); <u>see</u> 6 James Wm. Moore et al., <u>Moore's Federal Practice</u> § 24.03[5][a] (3d ed. 2004) ("Despite the label 'intervention of right,' courts exercise some discretion in weighing a motion to intervene under Rule 24(a)(2).").  Therefore, although "the requirements for intervention are to be construed in favor of intervention," <u>Am. Mar. Transp., Inc. v. United States</u>, 870 F.2d 1559, 1561 (Fed. Cir. 1989), courts routinely deny motions to intervene, <u>see, e.g.</u>, <u>id.</u> at 1563 (affirming denial of motion to intervene because applicant "had not claimed an interest recognized under Rule 24(a)").

III.    Discussion

        The applicants have shown that their motion to intervene is timely under RCFC 24.  However, because the applicants have not shown that they have an interest relating to the property or transaction that is the subject of the action and are so situated that, without intervention, the disposition of the action may, as a practical matter, impair or impede the applicants' ability to protect that interest, and that their interest is inadequately represented by the existing parties, they have failed to demonstrate the four factors

_____

        [2]The Rules of the United States Court of Federal Claims (RCFC) generally mirror the Federal Rules of Civil Procedure (FRCP).  <u>See</u> RCFC 24 rules comm. notes (2008) ("The language of RCFC 24 has been amended to conform to the general restyling of the FRCP."); <u>see also</u> <u>Am. Mar. Transp., Inc. v. United States</u>, 870 F.2d 1559, 1560 (Fed. Cir. 1989) (recognizing that RCFC 24(a) is "virtually identical" to FRCP 24(a)).  Therefore, the court relies on cases interpreting FRCP 24 as well as those interpreting RCFC 24.  <u>See</u> <u>Am. Mar. Transp.</u>, 870 F.2d at 1560 n.4; <u>see, e.g.</u>, <u>Klamath Irrigation Dist. v. United States</u>, 64 Fed. Cl. 328, 330-36 (2005).

required to intervene as of right.  See RCFC 24(a); Chippewa Cree, 85 Fed. Cl. at 654 (citing Freeman, 50 Fed. Cl. at 309).  Accordingly, their motion to intervene is DENIED.

A.    The Applicants' Interests Are Indirect and Contingent Upon Future Events

"In order to intervene of right, the interest of applicants in the property or transaction must be 'of such a direct and immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment.'"  Chippewa Cree, 85 Fed. Cl. at 654 (emphasis omitted) (quoting Am. Mar. Transp., 870 F.2d at 1561).  In other words, an applicant must show that it has an interest that is "direct, substantial, and legally protectable."  Klamath Irrigation Dist. v. United States, 64 Fed. Cl. 328, 331 (2005) (citing, inter alia, Am. Mar. Transp., 870 F.2d at 1561).  "The interest thus may not be either indirect or contingent."  Am. Mar. Transp., 870 F.2d at 1561 (citations omitted); see Moore et al., § 24.03[2][a] ("[A]n interest that is . . . contingent on the future occurrence of a sequence of events is insufficient.").

The applicants claim that they have the following three interests that entitle them to intervene as of right:  (1) "an interest in enforcing California Fish and Game Code section 5937," Mem. 13; (2) "an interest in defending and ensuring effective implementation of the Settlement that ended the eighteen-year-long litigation over Friant Dam," Mem. 14; and (3) the "interests that drove [the applicants] to fight an eighteen-year-long battle to restore the San Joaquin River," namely, for PCFFA, the reintroduction of the salmon population to the River and, for NRDC, the restoration of floodplains, fish and wildlife habitat and downstream river quality for the conservation, health, scientific, aesthetic and recreational purposes of its members, Mem. 14.

While their interests may be legally protectable, the applicants' interests are both indirect and contingent upon future events.  The applicants argue that their interests are direct and immediate because an adverse judgment "would trigger specific statutory provisions" in the Settlement Act, Reply 2; see Mem. 18-20, and "because an adverse judgment would influence the United States' exercise of discretion in performing its obligations under the Settlement Act," Mem. 20.  However, plaintiffs in this case seek only just compensation for their takings claims, see Compl. 1-2; Compl. Prayer for Relief ¶¶ 1-4, and the court is empowered to award only monetary compensation to plaintiffs for those claims, see Tucker Act, 28 U.S.C. § 1491(a) (2006).  Therefore, in deciding this case, the court will have to determine whether plaintiffs' takings claims are valid, but a judgment in favor of plaintiffs will mean only that they are entitled to payment from the United States.  A monetary award for plaintiffs would not deprive the applicants of any existing right to defend and implement their Settlement or to enforce California Fish and Game Code section 5937, nor would a monetary award to plaintiffs directly affect the

applicants' interests in restoring the salmon population and wildlife habitats in the River. In a takings case, where the sole direct result of a judgment in favor of the plaintiff is a monetary award from the government, and where the proposed intervenor does not have an interest in the plaintiff's property, the proposed intervenor has only an indirect interest in the litigation.  See Hage v. United States, 35 Fed. Cl. 737, 740-41 (1996) (stating that the proposed intervenor's interest was indirect because "[t]he only direct result of a victory by plaintiffs would be a monetary award paid by the federal government"); see also Freeman, 50 Fed. Cl. at 309 (stating that, in a takings case, the proposed intervenors had only an indirect interest in the case because "a ruling in favor of plaintiff will only mean he is entitled to payment" and the proposed intervenors "cannot show that payment of just compensation adversely affects them in any way").

The applicants' interests would suffer harm from an adverse judgment only if a chain of possible but uncertain events were to take place.  See Am. Mar. Transp., 870 F.2d at 1561.  The applicants claim that the statutory provision in the Settlement Act that prevents the United States from acquiring water rights through eminent domain would be triggered by an adverse judgment. Mem. 19.  The applicants themselves then describe the following chain of events that would have to take place following an adverse judgment to harm their interests:

> If this [c]ourt determines that the United States has taken water from [p]laintiffs without just compensation, then the United States may conclude that the Settlement Act prevents it from using that water, now or in the future, to restore the River.  Deprived of that water, the restoration program would suffer, as would [the] [a]pplicants' interests in implementing their Settlement, restoring the River, and reintroducing chinook salmon.

Reply 2-3 (emphasis added).  The applicants also admitted that the United States would not interpret the Settlement Agreement as prohibiting the government from using the water released from Friant Dam if "plaintiffs were willing to sell their water rights." Mem. 19.  In other words, in order for the applicants' interests to be adversely affected after a judgment for monetary compensation for plaintiffs, the following steps would have to occur:  (1) the agency responsible for implementing the Settlement Act would have to determine that it is statutorily prohibited from using certain water to restore the River unless plaintiffs sell their water rights to the government; (2) the agency would have to ask plaintiffs to sell their water rights to the government; (3) plaintiffs would have to refuse to sell their water rights; (4) the agency would have to determine that the River could not be adequately restored using other sources of water; and (5) the agency would have to decide not to implement the Settlement Act by restoring the River with water, which would only then affect the restoration of the salmon population to the River.  See

Reply 2-3; Mem. 18-20.  Furthermore, although the applicants claim that an adverse judgment would influence the United States' discretion in performing its obligations under the Settlement Act, Mem. 20, decisions as to liability and damages awards made in this case have no immediate consequence for the applicants because the court has no power to order the Secretary of the Interior to act or to enjoin the Secretary from taking any action, see Freeman, 50 Fed. Cl. at 309 (stating that in a takings case, the plaintiff would be entitled only to monetary relief from the government because the court lacked power to order the agency to issue a mineral patent).  Again, a chain of events much like the one described above would have to occur before the applicants' interests would be adversely affected.  "These speculative repercussions are contingent upon policy choices outside of the court's authority."  Hage, 35 Fed. Cl. at 741.

The applicants' expressed interests in this case are analogous to the interests examined in a prior case in which the asserted interests were found to be indirect or contingent.  The Hage plaintiffs brought a takings claim against the United States, alleging that the release of elk by Nevada's Department of Wildlife, which had been approved by the United States Forest Service, interfered with their rights under their grazing permits and their water rights because the elk reduced the amount of forage and water available for their cattle.  Id. at 739.  Various environmental groups and the Nevada Department of Wildlife filed a motion to intervene, claiming various interests, including "the right to the beneficial use of water claimed by plaintiffs, the right to the use and enjoyment of the rangeland and forage encompassed by plaintiffs' grazing permit and the right to determine the ownership of water rights which plaintiffs claimed they owned." Id.  Just as the applicants argue in this case that, following an adverse judgment, the United States may choose not to perform certain duties required by the Settlement Act, see Mem. 18-20, in Hage, the environmental groups argued that "if plaintiffs' claim succeeds, the Forest Service would not vigorously enforce its regulations or support proper land management and grazing policies," 35 Fed. Cl. at 741.  In addition, Nevada claimed that an adverse judgment would discourage the Forest Service from allowing future releases of wildlife on federal lands.  Id. at 740-41.  Finding that the environmental groups and Nevada had only indirect interests in the litigation, the court stated:

> [N]one of the repercussions described by the State or the environmental groups are certain to develop if plaintiffs succeed.  The court agrees that litigation and adverse judgments can affect agencies and their policies, but the court cannot assume that an adverse judgment necessarily will cause the effects which the groups predict. . . .  [T]he court cannot assume that an adverse judgment would cause the Forest Service to disregard its own regulations and statutory obligations. . . .  The above scenarios described by the State and the environmental groups are indirect and speculative at best.

Id. at 741.  As in this case, "The only direct result of a victory by plaintiffs would be a monetary award paid by the federal government."  Id.

The applicants' interests are therefore not "of such a direct and immediate character that the [applicants] will either gain or lose by the direct legal operation and effect of the judgment."  Am. Mar. Transp., 870 F.2d at 1561 (emphasis in original) (citations omitted).  Because the applicants do not have a direct and immediate legally protectable interest in the subject of the action, they do not meet the interest requirement of RCFC 24(a) and cannot intervene as of right.  Because failure to demonstrate one of the four factors is a complete bar to intervention as of right, the court need not determine whether the applicants demonstrated the remaining three factors.  See Chippewa Cree, 85 Fed. Cl. at 654 (citing Freeman, 50 Fed. Cl. at 309).  However, for completeness, the court examines the other factors in the intervention as of right analysis.

      B.      The Applicants Are Able to Protect Their Interests in Another Forum

The applicants "must also demonstrate that 'without intervention[,] the disposition of the action may, as a practical matter, impair or impede the applicants' ability to protect th[eir] interest[s].'"  Chippewa Cree, 85 Fed. Cl. at 656 (quoting Freeman, 50 Fed. Cl. at 308); see RCFC 24(a).  "The potential stare decisis effect of a decision often supplies the 'practical impairment' required by Rule 24(a)."  John R. Sand & Gravel Co. v. United States, 59 Fed. Cl. 645, 655 (2004) (quoting Anderson Columbia Envtl., Inc. v. United States (Anderson), 42 Fed. Cl. 880, 882 (1999)) (internal quotation marks omitted), aff'd sub nom. John R. Sand & Gravel Co. v. Brunswick Corp., 143 F. App'x 317 (Fed. Cir. 2005) (unpublished).  "The greater the precedential impact of a decision on the applicant, the more likely a court is to find that the applicant's interest is impaired."  Id. (citing Anderson, 42 Fed. Cl. at 882).  "A prospective intervenor is . . . not likely to suffer impairment of its interests where it is free to assert its rights in a separate action.  Moreover, the mere inconvenience caused by requiring the prospective intervenor to litigate the matter separately does not constitute the impairment required by Rule 24(a)."  Id. (alteration in original) (quoting Anderson, 42 Fed. Cl. at 882) (internal quotation marks omitted).  Therefore, "[t]he availability of alternative venues is a pivotal consideration in the intervention context," Chippewa Cree, 85 Fed. Cl. at 657 (citing Cheyenne-Arapaho Tribes of Indians of Okla. v. United States (Cheyenne-Arapaho), 1 Cl. Ct. 293, 296 n.4 (1983)), and "[n]umerous courts have found intervention to be inappropriate 'where relief is available elsewhere,'" id. (quoting Cheyenne-Arapaho, 1 Cl. Ct. at 296 n.4).

In this case, not only is relief unavailable in this court, relief is available elsewhere.  The applicants claim that they "are not likely to find relief in alternative

forums," because a finding by the court that plaintiffs have "property interests in both land and water that is central to implementing the Settlement . . . undoubtedly would impair or impede [the applicants'] ability to claim, in the future, that the same property should be used in a fashion that promotes their interests in restoring the River and reestablishing historical fish populations." Mem. 22 (brackets and ellipses omitted) (internal quotation omitted). However, this case is limited to a determination of whether defendant took plaintiffs' property and whether plaintiffs are entitled to just compensation. See Compl. 1-2; Compl. Prayer for Relief ¶¶ 1-4. Such determinations will not set precedent that could impede or impair the applicants' ability to enforce California Fish and Game Code section 5937 or deprive the applicants of any existing right to defend their Settlement. If the applicants believe that the United States is not meeting its obligations under their Settlement, the Settlement Act or California Fish and Game Code section 5937, the appropriate forum for raising these issues is in the United States District Court for the Eastern District of California, not this court. Because the disposition of this case does not impair or impede the applicants' ability to protect their interests, the applicants are barred from intervening as of right. See Chippewa Cree, 85 Fed. Cl. at 654 (citing Freeman, 50 Fed. Cl. at 309); RCFC 24(a).

C.     The United States Adequately Represents the Applicants' Interests

The "applicants must demonstrate that 'their interest is inadequately represented by the existing parties.'" Chippewa Cree, 85 Fed. Cl. at 658 (quoting Freeman, 50 Fed. Cl. at 308-09). "[W]hen the government is a party, it is presumed to represent the would-be intervenor's interest." Freeman, 50 Fed. Cl. at 310 (quoting Anderson, 42 Fed. Cl. at 883) (internal quotation marks omitted). "The applicants may rebut the presumption of adequate representation through a showing of collusion, adversity of interest, or nonfeasance." Id. (citing Anderson, 42 Fed. Cl. at 883).

In order to rebut the presumption of adequate representation, the applicants attempt to show only an adversity of interest between themselves and the United States. See Mem. 23-25. The applicants argue that the United States does not adequately represent their interests because "the interests of PCFFA, NRDC, and the United States diverge," as shown by the litigation between the government and the applicants leading to the Settlement. Reply 6-7. In particular, the applicants assert that the United States is interested in "protect[ing] its purse," but "is not motivated, as [a]pplicants are, to ensure that future releases [of water] are sufficient to permit the reestablishment of both spring-run and fall-run chinook salmon." Reply 7; see Mem. 25.

However, "a difference between the existing parties and the applicants to intervene as to the motives for litigation does not establish inadequacy of representation in the litigation." Moore, et al., § 24.03[4][a][i]; see Hage, 35 Fed. Cl. at 742 (stating that while

the proposed intervenors and the United States have different goals, "no evidence has been presented that their ultimate objectives in this litigation are different"); see also Freeman, 50 Fed. Cl. at 310 (stating that, although the applicants sought to prevent all mining, the applicants and the United States shared the same litigation goal, which was "a ruling that plaintiff is not entitled to just compensation because it has no valid mining claims"). Although the applicants and the United States were allegedly engaged in "18 years of contentious litigation" leading to the Settlement, Mem. 24 (quotation omitted), they seek the same ultimate objective in this litigation -- defeating plaintiffs' claims for just compensation. Furthermore, although the applicants argue that the United States is only interested in "protect[ing] its purse," Reply 7, "minimizing financial exposure is perhaps the surest sign of adequacy of representation, " Hage, 35 Fed. Cl. at 742. Because the litigation goal of both the applicants and the United States is the same, the applicants have not demonstrated that there is an "adversity of interest" between themselves and the United States. See John R. Sand & Gravel, 59 Fed. Cl. at 656. Therefore, because the applicants have failed to rebut the presumption of adequate representation by the United States, they are barred from intervening as of right. See Chippewa Cree, 85 Fed. Cl. at 654 (citing Freeman, 50 Fed. Cl. at 309); RCFC 24(a).

D.     The Applicants' Motion to Intervene is Timely

The applicants must show that their motion to intervene is timely. See RCFC 24(a); Chippewa Cree, 85 Fed. Cl. at 658. Timeliness "is to be determined by the court in the exercise of its sound discretion" and it is "to be determined from all the circumstances." NAACP v. New York, 413 U.S. 345, 366 (1973); see Moore et al., § 24.21[1] ("Judicial assessment of intervention timeliness is essentially discretionary."). In evaluating timeliness, the court should consider three factors: (1) the length of time during which the applicants actually knew or reasonably should have known of their rights; (2) whether the prejudice to the rights of existing parties by allowing intervention outweighs the prejudice to the applicants by denying intervention; and (3) the existence of unusual circumstances militating either for or against a determination that the application is timely. Chippewa Cree, 85 Fed. Cl. at 658 (citations omitted); Freeman, 50 Fed. Cl. at 308 (citations omitted). Because the parties do not identify, and the court cannot identify any unusual circumstances in this case, the court examines only the first two factors.

As to the first factor, assuming the applicants have legally protectable rights, a reasonable amount of time has passed between when the applicants actually knew or reasonably should have known of their rights and when the applicants filed their Motion to Intervene. Plaintiffs filed their Complaint on August 26, 2010, and the applicants filed their Motion to Intervene on March 8, 2011. Defendant has not yet filed an answer. The court has not set any deadlines for dispositive motions or for discovery, and the case has been referred to the alternative dispute resolution process with another judge. Because

12

this case is still in a preliminary stage, a request to intervene is timely.  See <u>Utah Ass'n of Cntys. v. Clinton</u> (<u>Utah Ass'n</u>), 255 F.3d 1246, 1250-51 (10th Cir. 2001) (finding that the request to intervene was timely because the case was "far from ready for final disposition; no scheduling order ha[d] been issued, no trial date set, and no cut-off date for motions set"); <u>see also</u> <u>John R. Sand & Gravel Co. v. Brunswick Corp.</u>, 143 F. App'x 317, 319 (Fed. Cir. 2005) (unpublished) (upholding the trial court's decision to deny intervention after a finding that "the case had proceeded well beyond a preliminary stage").

As to the second factor for timeliness, plaintiffs argue that "the prejudice to the parties if intervention is granted far outweighs any possible prejudice to the applicants if intervention is denied" because "[g]ranting intervention to the applicants would jeopardize any chance of reaching a negotiated settlement in this lawsuit and would prolong the efforts to reach resolution of the issues in this case should the parties' ADR efforts fail."  Pls.' Opp'n 3; <u>see</u> Pls.' Opp'n 14-16.  However, this is not the sort of "prejudice" that the case law recognizes as a basis for denying intervention as of right.  The prejudice inquiry "measures only the prejudice caused by a potential intervenor's delay and not that caused by the intervention itself."  <u>Chippewa Cree</u>, 85 Fed. Cl. at 659 (citing <u>Utah Ass'n</u>, 255 F.3d at 1251); <u>see</u> Moore et al., § 24.21[3] ("The relevant focus under the second timeliness factor is <u>only</u> the prejudice that may result from the applicant's delay in filing its motion after it reasonably should have know[n] of the potential impact of the action on its interest." (emphasis in original)).  Because this case is still in a preliminary stage with no deadlines set for discovery or dispositive motions, the parties are not prejudiced by a request to intervene.  <u>See</u> <u>Utah Ass'n</u>, 255 F.3d at 1250-51.  The applicants' Motion to Intervene is timely, but because the applicants failed to demonstrate the remaining three factors, they do not meet the requirements to intervene as of right.  <u>See</u> <u>Chippewa Cree</u>, 85 Fed. Cl. at 654 (citing <u>Freeman</u>, 50 Fed. Cl. at 309); RCFC 24(a).

IV.    Conclusion

For the foregoing reasons, Pacific Coast Federation of Fishermen's Associations and Natural Resources Defense Council's Motion to Intervene as Defendants is DENIED.


IT IS SO ORDERED.

s/ Emily C. Hewitt
EMILY C. HEWITT
Chief Judge

13